UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
CARMELO SOTO,

                        Plaintiff,

                                                    **MEMORANDUM & ORDER**

            - against -                             19-CV-4631 (PKC)

COMMISSIONER OF SOCIAL SECURITY,

                        Defendant.
-------------------------------------------------------x

PAMELA K. CHEN, United States District Judge:

Plaintiff Carmelo Soto brings this action under 42 U.S.C. § 405(g), seeking judicial review

of the decision of the Commissioner of the Social Security Administration ("SSA") denying

Plaintiff's claim for Social Security Disability Insurance Benefits ("DIB").  Before the Court are

the parties' cross-motions for judgment on the pleadings.  (Dkts. 9, 15.)  Plaintiff seeks an order

remanding this matter for further administrative proceedings, and the Commissioner asks the Court

to affirm the denial of Plaintiff's claim.  For the reasons that follow, the Court grants Plaintiff's

motion on the pleadings and denies the Commissioner's cross-motion.  This case is remanded for

further proceedings consistent with this Memorandum and Order.

## BACKGROUND

### I.    Procedural History

On August 31, 2017, Plaintiff filed an application for DIB, alleging disability beginning on

April 25, 2017.  (Administrative Transcript ("Tr."),[1] Dkt. 8, at 64–66.)  On December 27, 2017,

Plaintiff's application was initially denied.  (*Id.* at 85.)  On January 19, 2018, Plaintiff filed a

---

[1] Page references prefaced by "Tr." refer to the continuous pagination of the Administrative
Transcript (appearing in the lower right corner of each page) and not to the internal pagination of
the constituent documents or the pagination generated by the Court's CM/ECF docketing system.

1

request for a hearing before an administrative law judge ("ALJ").  (*Id.* at 96–97.)  On August 7, 2018, Plaintiff appeared with counsel before ALJ Ifeoma N. Iwuamadi.  (*Id.* at 34–63.)  In a decision dated March 4, 2019, the ALJ determined that Plaintiff was not disabled under the Social Security Act (the "Act") and was not eligible for DIB.  (*Id.* at 10–21.)  On June 13, 2019, the ALJ's decision became final when the Appeals Council of the SSA's Office of Appellate Operations denied Plaintiff's request for review of the ALJ decision.  (*Id.* at 1–6.)  Thereafter, Plaintiff timely[2] commenced this action.

## II.    The ALJ Decision

In evaluating disability claims, the ALJ must adhere to a five-step inquiry.  The claimant bears the burden of proof in the first four steps of the inquiry; the Commissioner bears the burden in the final step.  *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (citation omitted).  First, the ALJ determines whether the claimant is currently engaged in "substantial gainful activity."  20 C.F.R. § 404.1520(a)(4)(i).  If the answer is yes, the claimant is not disabled.  *Id.*  If the answer is no, the ALJ proceeds to the second step to determine whether the claimant suffers from a severe impairment.  *Id.* § 404.1520(a)(4)(ii).  An impairment is severe when it "significantly limits [the

_____

[2] According to Title 42, United States Code, Section 405(g),

> [a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner of Social Security may allow.

42. U.S.C. § 405(g).  "Under the applicable regulations, the mailing of the final decision is presumed received five days after it is dated unless the claimant makes a reasonable showing to the contrary."  *Kesoglides v. Comm'r of Soc. Sec.*, No. 13-CV-4724 (PKC), 2015 WL 1439862, at *3 (E.D.N.Y. Mar. 27, 2015) (citing 20 C.F.R. §§ 404.981, 422.210(c)).  Applying this standard, the Court determines that Plaintiff received the Commissioner's final decision on June 18, 2019, and that, because Plaintiff filed the instant action on August 12, 2019—55 days later—it is timely. (*See generally* Complaint, Dkt. 1.)

claimant's] physical or mental ability to do basic work activities."  *Id.* § 404.1520(c).  If the impairment is not severe, then the claimant is not disabled.  However, if the impairment is severe, the ALJ proceeds to the third step, and considers whether the impairment meets or equals one of the impairments listed in the Act's regulations (the "Listings").  *Id.* § 404.1520(a)(4)(iii); *see also id.* pt. 404, subpt. P, app. 1.  If the ALJ determines at step three that the claimant has one of the listed impairments, then the ALJ will find that the claimant is disabled under the Act.  On the other hand, if the claimant does not have a listed impairment, the ALJ must determine the claimant's residual functional capacity ("RFC") before continuing with steps four and five.  To determine the claimant's RFC, the ALJ must consider the claimant's "impairment(s), and any related symptoms . . . [which] may cause physical and mental limitations that affect what [the claimant] can do in a work setting."  *Id.* § 404.1545(a)(1).  The ALJ will then use the RFC determination in step four to determine if the claimant can perform past relevant work.  *Id.* § 404.1520(a)(4)(iv).  If the answer is yes, the claimant is not disabled.  Otherwise the ALJ will proceed to step five where the Commissioner then must determine whether the claimant, given the claimant's RFC, age, education, and work experience, has the capacity to perform other substantial gainful work in the national economy.  *Id.* § 404.1520(a)(4)(v).  If the answer is yes, the claimant is not disabled; otherwise the claimant is disabled and is entitled to benefits.  *Id.*

In this case, the ALJ found that Plaintiff had not engaged in substantial gainful activity since April 25, 2017, his alleged onset date, but noted that "[t]here are earnings post-alleged onset date that are at substantial gainful activity levels.  Because it is unclear whether this income is substantial gainful activity (could be disability or pension)," the ALJ proceeded to the second step and found that Plaintiff suffers from the following severe impairments: multiple sclerosis ("MS"),[3]

---

[3] As defined in the applicable regulations, MS

headaches, lumbar spine straightening, post-traumatic stress disorder ("PTSD"), major depressive disorder ("MDD"), and generalized anxiety disorder ("GAD").  (Tr., Dkt. 8, at 12–13 (citations omitted).)   The ALJ then progressed to the third step and determined that Plaintiff's severe impairments did not meet or medically equal the severity of one of the impairments in the Listings.  (*Id.* at 13.)

> Moving to the fourth step, the ALJ found that Plaintiff maintained
>
> the RFC to perform light work[4] as defined in 20 C.F.R. § 404.1567(b), with the following additional restrictions: [Plaintiff] could frequently climb ramps, stairs, ladders or scaffolds; continuously stoop and balance; frequently kneel, crouch or crawl with occasional exposure to extreme heat; [Plaintiff] is also able to handle simple, repetitive tasks, but not at a production rate pace; he is also limited to simple instructions, simple work-related decisions and occasional contact with supervisors, co-workers and the public, and occasional changes in his work setting.

(*Id.* at 15.)

---

> is a chronic, inflammatory, degenerative disorder that damages the myelin sheath surrounding the nerve fibers in the brain and spinal cord.  The damage disrupts the normal transmission of nerve impulses within the brain and between the brain and other parts of the body, causing impairment in muscle coordination, strength, balance, sensation, and vision.  There are several forms of MS, ranging from mildly to highly aggressive.  Milder forms generally involve acute attacks (exacerbations) with partial or complete recovery from signs and symptoms (remissions). Aggressive forms generally exhibit a steady progression of signs and symptoms with few or no remissions.  The effects of all forms vary from person to person.

20 C.F.R. pt. 404, subpt. P, app. 1, sec. 11.00(N)(1).

[4] According to the applicable regulations,

> [l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities.

*Id.* § 404.1567(b).

Based upon the RFC finding, the ALJ determined that Plaintiff was incapable of performing his past relevant work as an infantry and weapons soldier and diesel mechanic (*id.* at 20), but that he was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy," including the representative occupations of garment sorter, folder, and fruit cutter (*id.* at 21).  The ALJ accordingly concluded that Plaintiff was not disabled.  (*Id.*)

## STANDARD OF REVIEW

Unsuccessful claimants for disability benefits under the Act may bring an action in federal district court seeking judicial review of the Commissioner's denial of their benefits.  42 U.S.C. § 405(g).  In reviewing a final decision of the Commissioner, the Court's role is "limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard."  *Talavera*, 697 F.3d at 151 (internal quotation omitted).  "Substantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (internal quotations and alterations omitted).  "In determining whether the [Commissioner]'s findings were supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."  *Id.* (internal quotation omitted).  If there is substantial evidence in the record to support the Commissioner's findings as to any fact, those findings are conclusive and must be upheld.  42 U.S.C. § 405(g); *see also Cichocki v. Astrue*, 729 F.3d 172, 178 n.3 (2d Cir. 2013) ("An ALJ need not recite every piece of evidence that contributed to the decision, so long as the record permits [the court] to glean the rationale of an ALJ's decision." (internal quotation omitted)).  Ultimately, the reviewing court "defer[s] to the Commissioner's resolution of conflicting evidence," *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012)

(citation omitted), and, "[i]f evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld," *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) (citation omitted).

## DISCUSSION

Plaintiff argues that the ALJ's denial of benefits was not supported by substantial evidence.  (Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment ("Pl.'s Mem."), Dkt. 10, at 12–13.)  Specifically, Plaintiff argues that the ALJ erred in her RFC determination by failing to appropriately weigh medical opinion evidence and improperly analyzing Plaintiff's subjective statements.  (*Id.* at 13–21.)  The Court agrees, and finds remand warranted on these grounds.

## I.    New Regulations Regarding Weight to Be Given Medical Source Opinions

Previously, the SSA followed the "treating physician rule," which required the agency to give controlling weight to a treating source's opinion, so long as it was "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and not "inconsistent with the other substantial evidence" in the record.  20 C.F.R. § 416.927(c)(2).  The 2017 regulations changed this standard for DIB applications filed "on or after March 27, 2017."[5]  *Id.* § 404.1520c. Under the new regulations, the Commissioner will no longer "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources."  *Id.* § 404.1520c(a).  Instead, when evaluating the persuasiveness of medical opinions, the Commissioner will consider the following five factors: (1) supportability; (2) consistency; (3) relationship of the source with the

---

[5] Because Plaintiff filed his claim on August 31, 2017 (*see* Tr., Dkt. 8, at 64–66), the new regulations apply to this action.

claimant, including length of the treatment relationship, frequency of examination, purpose of the treatment relationship, extent of the treatment relationship, and whether the relationship is an examining relationship; (4) the medical source's specialization; and (5) other factors, including but not limited to "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the SSA] disability program's policies and evidentiary requirements." *Id.* § 404.1520c(c). Using these factors, the most important of which are supportability and consistency, the ALJ must articulate "how persuasive [she] find[s] all of the medical opinions and all of the prior administrative medical findings in [the claimant's] case record." *Id.* § 404.1520c(b).

With respect to the supportability factor, the regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(1). As to the consistency factor, the regulations provide that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(2). While the ALJ "*may*, but [is] not required to, explain how [she] considered" the factors of relationship with the claimant, the medical source's specialization, and other factors, the ALJ *must* "explain how [she] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings." *Id.* § 404.1520c(b)(2) (emphases added). However, where an ALJ "find[s] that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported and consistent with the record but are not exactly the

7

same," *see id.* §§ 404.1520c(c)(1)–(2), she must "articulate how [she] considered the other most

persuasive factors" for those opinions or findings, *id.* § 404.1520c(b)(3).

> Even though ALJs are no longer directed to afford controlling weight to treating source opinions—no matter how well supported and consistent with the record they may be—the regulations still recognize the "foundational nature" of the observations of treating sources, and "consistency with those observations is a factor in determining the value of any [treating source's] opinion."

*Shawn H. v. Comm'r of Soc. Sec.*, No. 19-CV-113 (JMC), 2020 WL 3969879, at *6 (D. Vt. July

14, 2020) (alteration in original) (quoting *Barrett v. Berryhill*, 906 F.3d 340, 343 (5th Cir. 2018));

*see also Brian O. v. Comm'r of Soc. Sec.*, No. 19-CV-983 (ATB), 2020 WL 3077009, at *4

(N.D.N.Y. June 10, 2020) (noting that, notwithstanding the "eliminat[ion of] the perceived

hierarchy of medical sources," the two most important factors of consistency and supportability

"are the 'same factors' that formed the foundation of the treating source rule" (quoting Revisions

to Rules, 82 Fed. Reg. 5844-01, at 5853)); *Barrett*, 906 F.3d at 343 ("[Examining physicians']

observations about an applicant's mental and physical condition are the first building block in the

disability determination.  They are the primary source that medical consultants and vocational

experts use to form their opinions.").  Because a treating source examines a claimant directly, they

"may have a better understanding of [a claimant's] impairment(s) . . . than if the medical source

only reviews evidence in [a claimant's] folder." 20 C.F.R. § 404.1520c(c)(3)(v); *see also Santiago*

*v. Barnhart*, 441 F. Supp. 2d 620, 629 (S.D.N.Y. 2006) (noting in the context of the treating

physician rule that "a physician who has a long history with a patient is better positioned to

evaluate the patient's disability than a doctor who observes the patient once" (citation omitted)).

## II.   The ALJ Failed to Accord Proper Weight to the Medical Source Opinions

The ALJ's RFC determination considered Plaintiff's hearing testimony; a number of

Plaintiff's treatment notes and records; and the opinions of Plaintiff's treating physicians, a

consultative examiner, and two non-examining medical experts.  (Tr., Dkt. 8, at 15–20.)  With

respect to Plaintiff's mental limitations, the ALJ noted that Plaintiff "was in active duty [in the military],[6] and now suffers from PTSD, MDD, and GAD.  He has problems with anger, irritability, [and] hyper-vigilance.  He self-isolates and has trouble [] trusting people." (*Id.* at 15–16.)  The ALJ summarized treatment notes and records made by Tony Payson, M.D., Daniel Suter, M.D., Toula Georgiou, Psy.D., Ann Monis, Psy.D., Maricela Chapman, LMFT,[7] H. Rozelman, Ph.D.,[8] and various medical providers at the Bronx Department of Veterans Affairs ("VA") Medical Center.  (*Id.* at 16–17 (record citations omitted).)  The ALJ found "somewhat persuasive" the opinion of Dr. Monis, partially persuasive the opinion of Dr. Suter, "not persuasive" the opinion of LMFT Chapman, "not persuasive" the opinion of Dr. Georgiou, and "somewhat persuasive" the opinion of Dr. Rozelman.  (*Id.* at 19–20.)  Based on this weighted consideration of the medical sources' opinions, the ALJ concluded that Plaintiff had "moderate restrictions in the areas of understanding, remembering, or applying information, interacting with others, and adapting or managing [him]self . . . due to the symptoms of hyper-startle response." (*Id.* at 20.)

With respect to Plaintiff's physical limitations, the ALJ noted that "the claimant was [] diagnosed with MS, which is supported by [an] MRI of the brain with findings compatible with MS.  A later MRI of the brain from August 10, 2017 showed evidence of demyelinating disease without acute demyelinating plaque," but the ALJ ultimately concluded that Plaintiff's MS "symptoms for the period at issue[] are not significant." (*Id.* at 17 (record citations omitted).)  The

---

[6] Plaintiff served in the military from 2005 to 2016, when he was medically discharged due to his MS, PTSD, and back pain.  (Tr., Dkt. 8, at 46, 396, 521.)

[7] An LMFT is a Licensed Marriage and Family Therapist.  *See Cote v. Berryhill*, No. 17-CV-01843 (SALM), 2018 WL 4092068, at *17 (D. Conn. Aug. 28, 2018).

[8] Dr. Rozelman is identified only by a first initial in the record.  (Tr., Dkt. 8, at 77.)

ALJ also noted that Plaintiff "was diagnosed with lumbosacral radiculopathy[9] associated with cervicalgia[10] and complicated with pain in the thoracic spine."  (*Id*).  According to the ALJ, however, this diagnosis was undermined by the fact that "the evidence [did] not contain[] diagnostic tests consistent with such [a] diagnosis."  (*Id.* at 17.)  The ALJ also noted that the physical exam that day, October 20, 2017, found "full strength 5/5, normal gait, intact sensory, and normal deep tendon reflexes although somewhat decreased range of motion."  (*Id.* at 17–18.) The ALJ went on to summarize treatment notes and records from consultative examiner ("CE") Caitlin Shaffer, M.D., and medical expert Dorothy Leong, M.D., and Plaintiff's daily activities as reflected by his testimony at the hearing and other medical records.  (*Id.* at 18.)  Finding "generally persuasive" the opinion of Dr. Leong, "not persuasive" the opinion of CE Shaffer, and persuasive in part the opinion of Plaintiff's internist, Monica Scantlebury, M.D., the ALJ concluded that "[o]verall, it appears that [Plaintiff] has the ability to manage his symptoms with medication to the point where work with . . . non-exertional limitations could be tolerated at this time."  (*Id.* at 18–19.)

Plaintiff argues that, in arriving at her RFC determination, the ALJ erred with respect to the weight she assigned to the opinions of Drs. Scantlebury, Suter, and Georgiou, and CE Shaffer.

---

[9] Radiculopathy occurs when a spinal nerve root "is sick or injured in the area where it leaves the spine," often causing pain, numbness, weakness, or muscle spasms in the leg and foot. *Lumbar Radiculopathy*, AM. ASS'N OF NEUROMUSCULAR & ELECTRODIAGNOSTIC MEDICINE, https://www.aanem.org/Patients/Muscle-and-Nerve-Disorders/Lumbar-Radiculopathy (last visited Sept. 29, 2020).

[10] Cervicalgia refers to neck pain.  *How to Treat Cervicalgia (Neck Pain)*, HEALTHLINE (April 22, 2020), https://www.healthline.com/health/cervicalgia.

(Pl.'s Mem., Dkt. 10, at 14.)  The Court agrees as to Drs. Scantlebury, Suter, and Georgiou for the reasons discussed below.[11]

## A.    Dr. Scantlebury

Dr. Scantlebury specializes in internal medicine (Tr., Dkt. 8, at 440) and served as Plaintiff's primary care physician at the Bronx VA Medical Center starting in April 2017 (*id.* at 402).  The record indicates that Dr. Scantlebury treated Plaintiff at least four times for MS and nasal sinus-related issues between April 2017 and August 2017.  (*Id.* at 311–27.)  Dr. Scantlebury noted Plaintiff's past medical history of MS, spinal stenosis,[12] torticollis,[13] right rotator cuff pain, obstructive sleep apnea, infantile seizures, constipation, PTSD, anxiety, and migraine headaches. (*Id.* at 317, 402–03.)   Dr. Scantlebury also documented that Plaintiff was taking fourteen medications, including gabapentin, mirtazapine, sildenafil, sumatriptan succinate, tolterodine tartrade,  methol/m-salicylate,  APAP+butalbital+caffeine,  atomoxetine,  dimethyl  fumarate, ibuprofen, modafinil, and tizanidine.  (*Id.* at 317–18.)

During the course of these examinations, Dr. Scantlebury noted that Plaintiff did not find effective the modafinil and strattera he was taking for ADD and concentration issues, and that he

---

[11] The Court does not reach the issue of whether the ALJ erred in the weight she assigned CE Shaffer's opinion.  As discussed *infra*, the record indicates at least some consistency with the opinion of CE Shaffer.  On remand, the ALJ should assess the weight of CE Shaffer's opinion while taking into account those consistencies.

[12] "Spinal stenosis is a narrowing of the spaces within [the] spine, which can put pressure on the nerves that travel through the spine.  [It] occurs most often in the lower back and the neck." *Spinal stenosis*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/spinal-stenosis/symptoms-causes/syc-20352961 (last visited Sept. 29, 2020).

[13] Torticollis "is a twisting of the neck that causes the head to rotate and tilt at an odd angle."     *Torticollis (Wryneck)*, JOHNS HOPKINS MEDICINE: HEALTH, https://www.hopkinsmedicine.org/health/conditions-and-diseases/torticollis-wryneck (last visited Sept. 29, 2020).

had "difficulty [with] energy and keeping up with his children."  (*Id.* at 317.)  While mirtazapine

helped with Plaintiff's sleep issues, it also made him feel groggy.  (*Id.*)  On April 26, 2017, Dr.

Scantlebury made a referral for a mental health consultation after conducting a PHQ-2[14] and PTSD

4Q tests and concluding that Plaintiff's mental health screening was negative for depression and

positive for PTSD.  (*Id.* at 407–08.)

On June 2, 2017, Dr. Scantlebury completed an assessment noting Plaintiff's MS

diagnosis,[15] and opined that Plaintiff was limited in lifting and carrying[16] because of his lower

extremity weakness and chronic lower back pain.  (*Id.* at 439.)  Dr. Scantlebury further opined

that, due to lower extremity weakness and lower back pain, Plaintiff could stand and/or walk for

only one hour in an eight-hour work day; could sit for eight hours in a work day; could never

climb, stoop, crouch, kneel, or crawl, but could occasionally bend and balance; and could

occasionally reach, feel/handle, and push/pull.  (*Id.* at 439–40.)  Dr. Scantlebury also noted the

environmental limitations of height, chemicals, fumes, moving machinery, dust, humidity,

temperature extremes, noise, and vibration.  (*Id.* at 440.)

The ALJ found Dr. Scantlebury's opinion persuasive as to the lifting and carrying

limitations, but not persuasive as to the standing/walking limitations "because the record reflects

---

[14] The Patient Health Questionnaire ("PHQ-2") "inquires about the degree to which an individual has experienced depressed mood and anhedonia over the past two weeks."  *Patient Health Questionnaire (PHQ-9 & PHQ-2)*, AM. PSYCH. ASS'N, https://www.apa.org/pi/about/publications/caregivers/practice-settings/assessment/tools/patient-health (last visited Sept. 29, 2020).

[15] Following an MRI on August 10, 2017, Dr. Scantlebury noted "demyelinating disease without acute demyelinating plaque [and] [a] focus of hyperintense T1 weighted signal within the sella without abnormal enhancement."  (Tr., Dkt. 8, at 319.)

[16] Dr. Scantlebury noted Plaintiff's lifting and carrying limitations as never being able to lift twenty to fifty pounds, occasionally lifting ten to twenty pounds, and frequently lifting five to ten pounds.  (Tr., Dkt. 8, at 439.)

little to no physical symptoms from the MS." (*Id.* at 19.)  The ALJ noted that Plaintiff's medical

"[r]ecords generally found [Plaintiff] to have normal gait, full strength 5/5, and no neurological

deficits (i.e. no atrophy, physiologic and equal deep tendon reflexes)." (*Id.* (record citations

omitted).)  In so reasoning, the ALJ cited an internal medicine examination conducted by CE

Shaffer on December 6, 2017. (*Id.* (citing *id.* at 456–61).)  That very report, however, reflected

the same lower extremity weakness and lower back pain that Dr. Scantlebury referenced in her

assessment.  CE Shaffer's report noted Plaintiff's complaints that he was experiencing left knee

weakness, likely due to his MS (*id.* at 457), and that his "left knee would occasionally buckle. . . .

He has had two falls since his diagnosis[,]" (*id.* at 456).  With respect to Plaintiff's torticollis and

lumbar spondylosis,[17] CE Shaffer noted that Plaintiff complained of neck and back spasms. (*Id.*

at 457.)  Upon examination, CE Shaffer observed that Plaintiff had a positive straight leg raising

test on the left leg "with radiation down to his knee" as well as "spasm to palpation in his left upper

back." (*Id.* at 459.)  In her medical source statement, CE Shaffer opined that Plaintiff was limited

to seated activities due to "intermittent weakness in his left knee from MS," and that Plaintiff had

"marked limitations for prolonged standing, walking, [and] climbing stairs from his MS and

lumbar spondylosis." (*Id.* at 460.)  Overall, CE Shaffer's opinion regarding Plaintiff's physical

limitations was highly consistent with that of Dr. Scantlebury.

  In addition to the opinion of CE Shaffer cited by the ALJ, other parts of the record are

consistent with Dr. Scantlebury's notes on the limitations caused by Plaintiff's MS-related left

knee weakness and lower back pain.  At the hearing, Plaintiff testified that his left knee "gives out

---

[17] Lumbar spondylosis is an arthritis in the lower spine "spurred by wear and tear" that occurs "when discs and joints degenerate, when bone spurs grow on the vertebrae, or both." Markus MacGill, *Spondylosis: All You Need to Know*, MEDICAL NEWS TODAY (Mar. 12, 2019), https://www.medicalnewstoday.com/articles/312598.

at any moment" if he "happen[s] to grab something, bend down to do something, [or] walk." (*Id.* at 49.)  Plaintiff also reported difficulty sitting because he "get[s] a jolt in [his] left knee[] and [his] lower back." (*Id.* at 50.)  He testified that he is "constantly leaning forward, or sitting back, or leaning to the side, because of pressure that builds up." (*Id.*)  When asked how long he could sit, Plaintiff answered that he could sit for a maximum of an hour to an hour and a half. (*Id.*)

On April 26, 2016, Shamsuddin Khwaja, M.D., of Killeen Neurology, P.A. noted Plaintiff's history of lower back pain, leg numbness in the past year, and weakness in his left leg. (*Id.* at 286.)[18]  Following the MRI, Dr. Khwaja also noted that Plaintiff "seems to suffer from demyelinating disease like multiple sclerosis and his left leg weakness," and that his leg "giving out during running is probably secondary to demyelinating lesions." (*Id.* at 289.)  On October 25, 2017, Rebecca Farber, M.D., Plaintiff's attending physician at the Bronx VA Medical Center, noted after a follow-up examination that imaging of Plaintiff's "brain showed lesions concerning for MS (in addition [cervical] spine, and [lumbosacral] spine reportedly showed degenerative disease)." (*Id.* at 508; *see also id.* at 507 (noting Plaintiff's "chronic lower back pains").)

Plaintiff also consulted with a chiropractor for neck, and middle and lower back pain on October 20, 2017. (*Id.* at 513.)  At the examination, Plaintiff reported a pain level of 4/10 and that he "[had] numbness and tingling down the back of the right leg." (*Id.*)  The chiropractor, Richard Iglesias, noted "tenderness with multiple trigger points" in Plaintiff's sternocleidomastoid muscle, posterior cervical muscles, levator scapulae, suboccipital muscles, and trapezius; and that static and motion palpation demonstrated "muscle contraction pain" in Plaintiff's rhomboids and subscapularis. (*Id.* at 513–14.)  He additionally noted Plaintiff's complaint that "[p]rolong[ed]

---

[18] Notably, although the record reflects that Plaintiff was seen by Dr. Khwaja several times between 2016 and 2018 (*id.* at 220, 273–89), the ALJ made no mention of Dr. Khwaja's treatment notes in her opinion (*see id.* at 10–21).

14

sitting and prolong[ed] standing aggravate[d] [Plaintiff's] condition.  Heat and lying down alleviate[d] his condition."  (*Id.*)  Mr. Iglesias diagnosed lumbosacral radiculopathy associated with cervicalgia and complicated with pain in the thoracic spine.  (*Id.* at 515.)  This diagnosis, too, is consistent with the limitations in Dr. Scantlebury's opinion.[19]

The ALJ also discounted Dr. Scantlebury's opinion by noting that "[she] does not specialize in neurological impairments like Medical Expert Dorothy Leong," who reviewed Plaintiff's medical records and whose opinion the ALJ found "generally persuasive."  (*Id.* at 18–19.)  Pursuant to the SSA's regulations, a medical source's specialization is just *one* factor relevant to the persuasiveness of that source's opinion, *see* 20 C.F.R. § 404.1520c(c), and is secondary in importance to the factors of consistency and supportability, *see id.* § 404.1520c(b)(2).  The fact that Dr. Scantlebury does not specialize in neurological impairments cannot alone render her opinion unpersuasive given its consistency and supportability.  Furthermore, the opinion of a non-examining medical source—even a specialist—is subject to limitations.  Courts in this Circuit long have casted doubt on assigning significant weight to the opinions of consultative examiners when those opinions are based solely on a review of the record.  *See, e.g.*, *Piorkowski v. Comm'r of Soc. Sec.*, No. 18-CV-3265 (FB), 2020 WL 5369053, at *2 (E.D.N.Y. Sept. 8, 2020) ("The general rule is that the written reports of medical advisors who have not personally examined the claimant

---

[19] To the extent that the ALJ found that "the evidence [did] not contain[] diagnostic tests consistent with such [] diagnosis" (Tr., Dkt. 8, at 17), she was obligated to develop the record as to those diagnostic tests.  *See Calzada v. Astrue*, 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010) (noting that an ALJ "must seek additional evidence or clarification when the report from the claimant's medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques" (internal quotation and citation omitted)); *see also Nusraty v. Colvin*, 213 F. Supp. 3d 425, 442 (E.D.N.Y. 2016) (finding that, under her "affirmative duty" to develop the record, the ALJ "should have followed up with [the treating physicians] to request supporting documentation or to obtain additional explanations for [their] findings" (collecting cases)).

deserve little weight in the overall evaluation of disability." (quoting *Vargas v. Sullivan*, 898 F.2d 293, 295 (2d Cir. 1990))).[20]   Thus, the Court concludes that the ALJ erred in discounting Dr. Scantlebury's opinion based on her lack of specialization in neurological impairments compared to Dr. Leong.   *See Shawn H.*, 2020 WL 3969879, at *8 ("Generally, where, as here, there are conflicting opinions between treating and consulting sources, the 'consulting physician's opinions or report should be given limited weight.'" (quoting *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990))); *Roman v. Astrue*, No. 10-CV-3085 (SLT), 2012 WL 4566128, at *16 (E.D.N.Y. Sept. 28, 2012) (finding error where the ALJ assigned significant weight to the medical opinion of a non-examining medical expert).

In light of the medical evidence supporting Dr. Scantlebury's opinion, the Court finds that the ALJ failed to properly evaluate the consistency and supportability of Dr. Scantlebury's opinion as required by 20 C.F.R. § 404.1520c.   Remand is warranted to accord Dr. Scantlebury's opinion proper weight.

### B.   Dr. Suter

In connection with the VA's confirmation of Plaintiff's disability benefits, psychiatrist Dr. Suter completed a Medical Assessment of Ability to Do Work Related Activities (Mental) on July

---

[20] *See also Soto-Rivera v. Comm'r of Soc. Sec.*, No. 17-CV-6675(JWF), 2019 WL 2718236, at *3 (W.D.N.Y. June 28, 2019) ("An analytical standard related to the treating physician rule is the principle that in determining eligibility for benefits, the Commissioner should generally not rely on the medical opinions of non-treating and non-examining medical sources."); *Ciambra v. Colvin*, No. 15-CV-3474 (SJF), 2017 WL 1323758, at *10 (E.D.N.Y. Mar. 27, 2017) ("Courts in the Second Circuit have observed that the medical opinion of a non-examining medical expert does not constitute substantial evidence and may not be accorded significant weight." (internal quotation omitted) (collecting cases)); *Minsky v. Apfel*, 65 F. Supp. 2d 124, 139 (E.D.N.Y. 1999) ("[Medical] advisers' assessment of what other doctors find is hardly a basis for competent evaluation without a personal examination of the claimant." (quoting *Vargas*, 898 F.2d at 295–96)); *Filocomo v. Chater*, 944 F. Supp. 165, 169 n.4 (E.D.N.Y. 1996) ("The conclusions of a physician who merely reviews a medical file and performs no examination are entitled to little if any weight." (citation omitted)).

21, 2017.  (Tr., Dkt. 8, at 442–43.)  In the assessment, Dr. Suter gave Plaintiff the following ratings: "fair" in following work rules; "fair" in relating to co-workers; "poor or none" in dealing with the public; "fair" in using judgment; "fair" in interacting with supervisor(s); "poor or none" in dealing with work stresses; "fair" in functioning independently; "fair" in maintaining attention/concentration; "good" in understanding, remembering, and carrying out complex, detailed, and simple job instructions; "fair" in maintaining his personal appearance; "poor or none" in behaving in an emotionally stable manner; "poor or none" in relating predictably in social situations; and "fair" in demonstrating reliability.[21]  (*Id.*)

In describing Plaintiff's limitations, Dr. Suter wrote:

> Mr. Soto has a history of PTSD and is going through a number of life stressors currently, which, on top of his PTSD are impacting his interpersonal skills and ability to cope with further stressors.  He has had trouble managing his anger [and] emotions and is acting more impulsively. . . .  Mr. Soto has trouble managing his emotional state and can react in impulsive and unpredictable ways due to his PTSD, new medical diagnoses [and] relationship problems.

(*Id.* at 442.)

The ALJ found Dr. Suter's opinion persuasive, except in his finding that Plaintiff had a poor ability to deal with work stresses.  (*Id.* at 19.)  In support of this finding, the ALJ reasoned that

> [Plaintiff] is currently in school, and although he testified to accommodations, he is still able to handle a full class load without decompensation.  The record shows improvement with treatment.  [Plaintiff] does have some limitations with social interactions, but not as severe as [in] this opinion.  This is evidenced by the fact that he is able to go to school and maintain contact with the public without any incidents.

---

[21] The assessment form directed providers to describe the claimant's ability in an area as "unlimited/ very good" when their "ability to function in this area is more than satisfactory;" as "good" when their "ability to function in this area is limited but satisfactory;" as "fair" when their "ability to function in this area is seriously limited, but not precluded;" and as "poor or none" when they have "[n]o useful ability to function in [that] area."  (Tr., Dkt. 8, at 442.)

(*Id.*)

The Court finds that the ALJ's reasoning is not supported by substantial evidence and that her discounting of Dr. Suter's opinion regarding Plaintiff's limited ability to handle work stress was error.  First, evidence in the record is consistent with Dr. Suter's opinion.  Specifically, Dr. Suter's opinion is supported by, and consistent with, the treatment notes of psychiatrist Harold Koenigsburg, M.D., and a letter by Plaintiff's therapist, Maricela Chapman.  Plaintiff was treated by Dr. Koenigsburg multiple times at the Bronx VA Medical Center for his PTSD, ADHD, and cognitive impairment secondary to MS.  (*Id.* at 496, 520–22.)  Dr. Koenigsburg noted on October 12, 2017 that Plaintiff reported mild depression, fatigue, and combat-related nightmares about three times a week.  (*Id.* at 521.)  Plaintiff also reported avoiding crowds, losing interest in social situations, finding it difficult to trust people, and having hypervigilance.  (*Id.*)  Dr. Koenigsburg also noted on November 13, 2017 that Plaintiff's nighttime insomnia and fatigue were interfering with his school performance and concentration because he needed to take daytime naps.  (*Id.* at 496; *see also id.* at 587 (noting Plaintiff's report that he sleeps three hours per night due to insomnia, and frequently naps during the day).)  Plaintiff indicated his preference to take as few medications as possible, as he thought they might have contributed to the fatigue.  (*Id.* at 496.)  Though Dr. Koenigsburg observed that Plaintiff was neatly groomed, maintained good eye contact, and appeared pleasant and cooperative, he also noted that Plaintiff reported feeling depressed for some time each day.  (*Id.*)

Additionally, Plaintiff received mental health therapy from LMFT Chapman from May 9, 2016 until April 25, 2017.  (*Id.* at 446.)  LMFT Chapman reported that Plaintiff suffered from depression, anxiety, PTSD, and experienced nightmares, panic attacks, social anxiety, and startle response.  (*Id.*)  With respect to Plaintiff's PTSD, LMFT Chapman explained that Plaintiff

"constantly felt as if there was going to be mortar attacks as when he was on deployment," and would often have nightmares and "jump out of bed and try to seek a defense position, thinking that he was hurting someone in his sleep." (*Id.*) LMFT Chapman noted that Plaintiff has difficulty trusting people and functioning in social settings, was in therapy for his anger issues, and that "[Plaintiff]'s insomnia, anxiety, depression and social isolation [a]ffected every aspect of his life. His family communication had diminished and he reported that his depression and lack of sleep had consumed his life." (*Id.* at 447.) Ultimately, LMFT Chapman concluded that "[t]he experience from the military has left [Plaintiff] [] unable to work."[22] (*Id.*)

Second, Dr. Suter's opinion about Plaintiff's limited ability to handle work stress is supported by Plaintiff's hearing testimony. At the hearing, Plaintiff made clear the limits of his functionality and the restrictions that must be made to accommodate those limits. Plaintiff testified that, during the summer semester, he attended classes four days a week for only an hour and a half each day. (*Id.* at 40.) Once the fall semester started, Plaintiff testified that he would attend classes three days a week but required breaks between classes because of his fatigue and inability to concentrate. (*Id.* at 40–41.) Plaintiff also explained that he had been prescribed Adderall, but that it "[took] about half an hour to kick in, and then . . . [he] get[s] about an hour to two hours of active dosage. And then after, it dies down, and [he is] back to where [he] started. [And] [he] can only

---

[22] To the extent that the ALJ discounted LMFT Chapman's opinion as "not persuasive as [her] opinion is not from an acceptable medical source" (*id.* at 19), the Court finds this determination to be in error. First, the new regulations "no longer differentiate[] between 'acceptable' and 'other' medical sources." *Natasha D. v. Comm'r of Soc. Sec.*, No. 19-CV-515 (ATB), 2020 WL 1862966, at *7 n.15 (N.D.N.Y. Apr. 13, 2020). Evidence from nonmedical sources is still a category of evidence to be considered pursuant to 20 C.F.R. § 404.1513(a)(4). Second, even under the old regulations' differentiation between "acceptable" and "other" medical sources, an ALJ "need not have given [LMFTs'] opinions controlling weight, but [should] appropriately [give] their opinions 'some consideration.'" *Perkins v. Berryhill*, No. 17-CV-200 (MPS), 2018 WL 3344227, at *7 n.8 (D. Conn. July 9, 2018) (quoting *Kohler v. Astrue*, 546 F.3d 260, 268 (2d Cir. 2008)).

take one dose per day."  (*Id.* at 42.)  Plaintiff further noted that the Adderall "doesn't guarantee that [his] fatigue doesn't kick in" (*id.* at 41) as a result of his MS (*id.* at 47).

With respect to his PTSD, Plaintiff testified that he "ha[s] a heightened alert system" and "tend[s] to panic" when, for example, firecrackers go off.  (*Id.* at 51.)  Plaintiff also testified that he dislikes crowds and interacts with his classmates only when required to during group activities.  (*Id.* at 52.)  He explained that he avoids public transportation due to "overcrowding of the trains" and his PTSD, which makes him "too suspicious, and very alert to everything and anything around [him].  [He]'ll just pretty much be on attack mode without actually attacking anyone."  (*Id.* at 54.)  When asked about his daily activities, Plaintiff explained that his doctors advised him to avoid heat due to his MS, and strenuous work due to his fatigue, and thus he does not cook, wash dishes, do laundry, go grocery shopping, or care for his children beyond sitting and playing with them, despite having done all of those tasks prior to the development of his conditions.  (*Id.* at 53, 55.)  He further testified that he uses "apparatuses that were given to [him] for dressing, and also for bathing," and that he "tend[s] to bathe rather than shower, because [he] ha[s] to stand to shower," which is too strenuous.  (*Id.* at 54.)

While an ALJ is not "required to credit [a plaintiff]'s testimony about the severity of [his] pain and the functional limitations it cause[s]," *Rivers v. Astrue*, 280 F. App'x 20, 22 (2d Cir. 2008) (summary order), the ALJ does not have unbounded discretion in choosing to reject it; instead, the ALJ must determine whether a Plaintiff's statements as to his pain and limitations are consistent with the objective medical evidence, *see Correale-Englehart v. Astrue*, 687 F. Supp. 2d 396, 435 (S.D.N.Y. 2010) ("The issue is . . . whether plaintiff's statements about the intensity, persistence, or functionally limiting effects of [his] pain are consistent with the objective medical and other evidence." (citations omitted)).  Here, the limitations that Plaintiff testified to in his

academic and daily activities are consistent with the medical and other evidence regarding his limited mental and physical functioning. *See Nusraty*, 213 F. Supp. 3d at 440 ("[A] claimant need not be an invalid to be found disabled.").[23] The Court therefore finds that the ALJ erred in her analysis of Plaintiff's subjective statements regarding his limitations, and by not factoring in those statements when rejecting Dr. Suter's July 21, 2017 assessment of Plaintiff's ability to handle work stress.

In sum, the Court finds that the ALJ erred in finding Dr. Suter's opinion undermined by the fact that Plaintiff attends class, and that medical evidence in the record is otherwise consistent with Dr. Suter's opinion. Remand is warranted to allow the ALJ to consider the consistency and supportability of Dr. Suter's opinion without overstating Plaintiff's functionality based on his limited school attendance.

### C.     Dr. Georgiou

On November 8, 2017, Dr. Georgiou completed a psychiatric evaluation of Plaintiff. (Tr., Dkt. 8, at 451–54.) Dr. Georgiou noted that Plaintiff had started psychiatric treatment while he was still on active duty, and, as of the date of the evaluation, was being seen twice a month by a psychiatrist and once a week by a psychologist for PTSD and depression. (*Id.* at 451.) Dr. Georgiou diagnosed Plaintiff with an unspecified depressive disorder, PTSD, and a history of attention deficit hyperactivity disorder, and opined that

> [Plaintiff] may have difficulties regulating his emotions, maintain[ing] a regular work schedule, working at a consistent pace, interacting with others at times, having to perform complex tasks at times, and making work related decisions due to psychiatric issues. Results of the present evaluation appear to be consistent with

---

[23] Even if Plaintiff did not have such limitations, "it is well-settled that the performance of basic daily activities does not necessarily contradict allegations of disability, as people should not be penalized for enduring the pain of their disability in order to care for themselves." *Cabibi v. Colvin*, 50 F. Supp. 3d 213, 238 (E.D.N.Y. 2014) (internal quotation and citations omitted).

> psychiatric difficulties and this may significantly interfere with the claimant's
> ability to function on a daily basis.

(*Id.* at 453.)

The ALJ found Dr. Georgiou's opinion "not persuasive because it is not supported by the record." (*Id.* at 19 (record citation omitted).)  In reaching this conclusion, the ALJ noted that

> [t]he claimant is able to handle a regular schedule as a full-time student, and he has
> no psychiatric hospitalizations or decompensation.  This supports the ability to
> regulate his emotions and maintain a regular schedule, which he does [] while in
> school.  He is able to interact with students without any noted incidents, handle
> tests, homework, and projects from college.  There is no interference on a daily
> basis as he is still in college and testified that he will look for work after college.

(*Id.* at 19.)  The ALJ also relied on "[Plaintiff]'s activities of daily living" and pointed out that he is married with two young kids.  (*Id.* at 18.)  "He also cares for his personal needs and drives a vehicle.  Overall, it appears that [Plaintiff] has the ability to manage his symptoms with medication to the point where work with the [determined RFC] could be tolerated at this time."  (*Id.* at 18.)

As discussed above, Plaintiff made clear at the hearing that his functionality with respect to his schooling and daily activities was limited.  The ALJ's evaluation of the consistency and supportability of Dr. Georgiou's opinion was thus in error, and remand is warranted to allow the ALJ to afford proper weight to Dr. Georgiou's opinion.

**CONCLUSION**

For the reasons set forth above, the Court grants Plaintiff's motion for judgment on the pleadings and denies the Commissioner's cross-motion.   The Commissioner's decision is remanded for further consideration consistent with this Memorandum and Order.   The Clerk of Court is respectfully directed to enter judgment and close this case accordingly.


SO ORDERED.


*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: September 30, 2020
         Brooklyn, New York

23